UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | |
|---|---|
| LATASHA HOLLOWAY,<br>In her Capacity as the Mother and<br>Next Friend of E.C., Q.C., Minors<br><br>                                       *Plaintiff,*<br><br>v.<br><br>**VIRGINIA BEACH PUBLIC SCHOOL<br>BOARD**, *et al.*<br><br>                                       *Defendants.* | Civil Action No. 2:19-cv-00104<br>JURY DEMANDED BY<br>PLAINTIFF |

**REPLY TO PLAINTIFF HOLLOWAY'S RESPONSE IN OPPOSITION TO
DEFENDANT ALISON WILLIAMS, CARI HALL, AND SCHOOL BOARD'S
MOTION FOR SUMMARY JUDGMENT**

      NOW COME Defendants, Alison Williams ("Williams"), Cari Hall ("Hall"), and the School Board for the City of Virginia Beach ("School Board"), by counsel, and submit the following Reply to Plaintiff Holloway's Opposition to Defendants' Motion for Summary Judgment:

**I.**     **Summary Judgment is proper when facts are not *genuinely* in dispute**

      LaTasha Holloway ("Holloway") bases her claims on what her children, E.C. and Q.C., allegedly told her five years ago that she has continually discussed with them during the interim time period. In 2017, when the alleged incidents occurred that form the basis of Holloway's Third Amended Complaint, E.C. was six years old and Q.C. was only five years old. Per Holloway, both children are special needs and Q.C. lacked the ability to communicate effectively due to selective mutism. [Holloway deposition, p. 27]. In fact, Holloway claims that E.C. and Q.C. are reliable and credible witnesses for the coached statements that suit her, but disregards their statements that do

1

not. For example, neither E.C. nor Q.C. even remembered Defendant Williams.[1] Holloway claims Q.C. was locked in the "confinement torture chamber" every day for hours at a time yet Q.C. recalled two to five times for about 10 minutes during lunch (which Defendants deny she was ever in the quiet room).[2] Furthermore, the facts clearly establish that Holloway only learned of the quiet room's

---

[1] E.C. Deposition [8:5-14]:

Q. Do you remember -- now I know that you used to be at Rosemont Elementary School. So I just have a few questions for Rosemont, when you were -- you were in first grade then, right?
A. Yes.
Q. And was your teacher Ms. Roth?
A. I don't know.
Q. Do you remember Ms. Alison Williams?
A. I remember the name, but I don't really remember her.

Q.C. Deposition [11:16-11:24]:

Q. Tell me, do you remember anybody other than Mr. Gilbert from your time at Rosemont Elementary?
A. Ms. Hall.
Q. Okay. Tell me about Ms. Hall.
A. She also puts children in the quiet room.
Q. What children?
A. Just me and him.
Q. Anybody else?
A. Nope. Just me and him.

[2] Q.C. Deposition [9:3-6; 10:6-11; 11:25-12:1]:

Q. When were you put in the quiet room?
A. When I cried.
Q. When? How many times?
A. Like every day.
                …
A. Like at lunchtime they would put me in the quiet room because I would cry or wine or something.
Q. And then how long were you there?
A. Until lunchtime was over.
Q. So like 10 minutes?
A. I guess so.
                …
Q. How many times were you in the quiet room?
A. About two, maybe even five.

existence in June 2017 after she claims E.C. matter-of-factly stated he did not want to be locked in a room.[3] Prior to June 2017, Holloway had no indication anything was wrong. Now, Holloway claims E.C. and Q.C. were locked in a dark "torture chamber" every day for hours at a time, despite no evidence to support such contentions other than her own self-serving statements.

## II. Reply to Holloway's Response to Statement of Undisputed Material Facts

Holloway's response to Defendants' Statement of Undisputed Material Facts is misleading. Each is addressed in turn.

Paragraph 6 is materially accurate; Holloway's response is misleading. The room was developed by the Board Certified Behavior Analyst and the modification that Holloway complains of is the removal of the posters on the wall after another student tore them down and the other items became projectiles by the student.[4]

---

[3] Holloway Deposition [65:10-25]:
Q. So now, Ms. Holloway, you say every day that you are now claiming E.C. was put into this room with motion-activated lights that is off the main hallway in the school. What evidence do you have to say that E.C. was put in that room every day?
A. That's what E.C. reported once again to the police officer.
Q. In June of 2017, correct?
A. That is correct.
Q. When he matter of factly said to you, I don't want to be locked in a room?
A. That is correct.
Q. So he did not say anything prior to June; is that correct?
A. No. I had no knowledge these things were happening.

[4] Hall Deposition [12:5-21]:
The room was called a de-escalation room. The BCBA made posters that went on a wall that had calming strategies. She also provided us with beanbags, fidgets, calming toys to be kept in the room.
Q. Were those beanbags, posters and toys always kept in the room?
A. No.
Q. What point were they taken out of the room?
A. When they became projectile.
All of the posters were torn down from the room. The fidgets had to be removed because they were projectile.

Paragraph 7 is accurate and Holloway disputes the paragraph only to the extent that it implies that a first grader would have known how to use a door handle. It is reasonable to infer that the children knew how to use a door handle and there is no evidence to the contrary anywhere in the record.

Paragraph 9: It is undisputed that the quiet room door handle was a lever door handle with an interior push lock. As such, the door could be open from the inside at all times, even while locked from the outside. Thus it is not reasonable to state that such a door posed any danger.

Paragraph 13 and 14: Holloway's response is misleading. While Hall may have at one point stated that E.C. "did not have a violent bone in his body" there is no temporal description when Holloway claims this statement was made. In fact, it is undisputed that E.C. was at one time a sweet child but that something happened in 2017 following attendance issues where the behavior changed and rapidly escalated.[5]

---

The beanbags have always – were always there. They were used for students to sit on or as a form of protection.

[5] Hall Deposition [68:11-69:11]:
Q. Now, you also had testified that E.C.'s behavior started to escalate at the end of March of 2017; is that correct?
A. Yes. Ish March, yes.
Q. You also testified in response to Mr. Paul's questions that there were some attendance issues for E.C.; is that correct?
A. Correct.
Q. What was the relation of the timing of the attendance issues and E.C.'s behavior escalation?
A. So the best of my understanding, I believe some attendance issues started after the first of the year. So one could believe that attendance issues could contribute to behaviors.
A student not want- -- I think that there was a student that -- his sibling was being homebound and I think that there was a desire from E.C. to want to stay home, which we considered to be an antecedent to his behavior.
Q. Did E.C. have problems with this behavior in the fall of 2016, at the beginning of the 2016/2017 school year?
A. E.C. was an active little boy, but nothing that would have required any disciplinary action the teacher couldn't handle on her own.

Paragraph 16: When the Defendants need to reach Holloway, she was unreachable.

Paragraph 17: It is undisputed that Holloway was not at school and never witnessed E.C.'s behavior in the classroom or in Hall's office. Accordingly, Holloway relies on pure speculation that E.C. did not act in exactly the manner in which Williams and Hall describe.[6]

Paragraph 19: There is no credible evidence to support Holloway's allegations that the children were in the quiet room for more than fifteen minutes for de-escalation purposes. All Defendants agree that it would be inappropriate to place children alone in a dark, locked room for hours on end. This is not what occurred and there is no credible evidence to support any such contention, only the greatly embellished and self-serving statements of Holloway, who was not there at the school at any time when the quiet room was used.

Paragraph 20: Holloway has no credible evidence to dispute this fact. She relies on clearly inconsistent and unreliable statements allegedly made by the two young children five years ago.

Paragraph 21: Defendants attempted to inform Holloway of the use of the quiet room but she did not answer her phone, and told Defendants to do whatever they had to do to keep the children in school after the time when Hall and the guidance counselor drove E.C. home after Holloway could not be reached. It was after that point that the quiet room was used.[7]

---

[6] Holloway deposition [74:18-20]
Q. But you were not there at school and you did not witness E.C.'s behavior in the classroom, correct?
A. I did not witness it …

[7] Hall Deposition [25:10-26:9]:
Q When was the first time you had a conversation with E.C.'s mother about his placement in the quiet room?
A. I have no idea.
Q. Was it after the first time he was placed in the quiet room?
A. I'm positive the incident when he was in my office and throwing things ended with the guidance counselor and I taking him home because we could not get mom on the phone.

Paragraph 22 and 23: An IEP was in process during the late spring 2017. Furthermore, the Statement by Rashard J. Wright, which Holloway attached to her Opposition brief as an exhibit [Doc. 49-1] for establishing the fact of an IEP being in place, describes in great detail the tremendously difficult, disruptive, and dangerous behavior in which E.C. engaged at Rosemont Elementary School. This statement accurately describes the challenges E.C. posed to the Defendants:

> In the case of former Rosemont Elementary School student E.C., …the student's behavior at Rosemont was an ongoing safety risk for himself as well as his classmates. *There were documented cases of the student running from the building, kicking or pushing objects within the classroom, and other inappropriate behavior*. In fact, last school year alone, the student was disciplined eight separate times for offenses ranging from defiance and insubordination to physical abuse and harassment. *On the days when he was removed from the classroom, the student had been throwing objects in his class, including book boxes and chairs, putting classmates and staff at risk of injury and disrupting instruction.*
>
> Due to this behavior, it was necessary to remove the student from the classroom. Staff members were also adhering to the student's Individualized Education Program (IEP). That plan, approved by the IEP team – which included the parent, her advocates, and school staff – states that when the student is overwhelmed or frustrated, he must have access to a safe space to calm down for no longer than 10 minutes. However, *when the student refuses to leave the classroom, the IEP cannot be implemented effectively*. The recordings show that the student was consistently uncooperative when asked to leave the classroom, often dropping to the floor, going limp or pulling furniture to avoid leaving the classroom.

---

We arrived at the house. No one answered the door. E.C. opened the door and mom was in the middle of the living room on her phone. So after that event is when the quiet room started to be used.

Q. Okay. Did you discuss with Miss Holloway before you used the quiet room the first time that you were going to place her child in this quiet room?

A. I remember a conversation where she said, You do whatever you have to do to keep my child in this building. I would assume at that meeting -- again, this is five years ago. I would assume at that meeting that we had that conversation.

…

6

> When he was taken to a quiet area near the administrative offices, the student's behavior often escalated. For example, in the course of the human resources investigation, it was revealed that *following the student's removal from the classroom, the principal was reportedly hit, kicked and had items thrown at her by the student.* Despite his behavior, the principal's response to her student was to tell him that she cared for him, that she was there to help him and that he needed to calm down so that he could return to class.
> …
>
> Please note that this family has faced significant challenges during the past few years and Virginia Beach City Public Schools has worked with the family and outside agencies to assist the family in addressing issues in the home that are affecting the student's education. Although many services have been provided, this family has continued to experience a pattern of excessive absences. *In this case, being absent, arriving to school late or being checked out early (more than 40 times last school year), limited the School Division's ability to work with the student to address his educational needs.*
>
> It should be noted that the school did attempt to contact the parent and other designated family members with regard to attendance and when incidents happened, *but the parent did not regularly answer such calls and did not provide a method for leaving messages.* Communication challenges have been a frequent impediment.

[Doc. 49-1] Statement from Rashard J. Wright, Chief Schools Officer, regarding former Rosemont Elementary School Student E.C. (excerpt) (emphasis added).

Paragraph 24: The evidence establishes that E.C. was only placed in the quiet room (and not "secluded") five times.

Paragraph 25: Hall testified that the videos only remained Rosemont Elementary School for "mere days" and that requests after that time would have to go through Safe Schools.[8]

---

[8] Hall Deposition [52:1-53:18; 54:12-22]:
Q. Are there cameras in the hallway where the quiet room is?
A. Yes.
Q. How long are those security camera tapes kept for?
A. I think it's 30 days. I don't know. The video that was publicized, there is in there where Miss Holloway thinks we are going into the quiet room. We are merely going into a classroom.

Paragraph 32-34: The video speaks for itself and Holloway offers only her own self-serving interpretation of the video when she was not there and bases her conclusions on viewing the video herself. To the contrary, Williams testified from her personal observations and the video shows a defiant E.C. refusing to cooperate with Williams and/or Hall.

Paragraph 37: Holloway has presented no reliable evidence that Q.C. was ever placed in the quiet room.

### III. Response to Holloway's "Additional Facts Supported by the Record"

1. This alleged fact is misleading. The facts establish that the quiet room was used for what amounts to a supervised "timeout" for de-escalation purposes. School personnel are not required to obtain advance permission from a parent for every action taken within the school.

---

We are merely going into a classroom for him to deescalate. You can see us enter the classroom and you can see us leave the classroom, but that is not the quiet room.
Q. Who has access to the videotapes from the hallways of the school?
A. They are all central. It's all centrally managed.
Q. Did Miss Holloway ever express to you when you talked to her that she wanted to see the videotapes of her child being placed in the classroom -- I'm sorry, being placed in the quiet room?
A. She did through her FOIA request. She had to do the FOIA request. It didn't come through me at that point.
Q. Prior to the FOIA request, did she express to you that she wanted to see the videotapes of her child being placed in that room?
A. I do not believe so, no.
Q. If she said that that happened, you think she's mistaken or you just don't recall?
A. So any access to the videotapes would have to go through a FOIA request at that point, any access to the tapes. What is stored locally within the building is mere days. So that's all managed centrally. Somebody else had to go back and access the tapes to pull it up. So I would say no. That was not a request that was made to me.
Q. Did you have any discussion with Miss Holloway at all about obtaining those videos?
A. Not to my recollection.
 …
Q. Who would be the best person at the School District to talk about how those security tapes were kept? Let me ask the question differently. If you wanted to learn things about how to access the tapes or if you needed information, who would you contact to ask those questions?
A. So Safe Schools -- our Safe Schools Department managed it at the time. They were the ones that reviewed the tapes and were looking.

2. This alleged fact is true to the extent that Holloway deliberately avoided attempts by Defendants to notify her as she did not answer her phone and her voicemail was full and thus messages could not be left.

3. Agreed to the extent that E.C. exhibited such problematic and concerning behaviors.

4. This is disputed. Holloway made clear when Hall brought E.C. home the one time that she wanted Defendants to do whatever they had to do to keep him in school. (see fn. 7, *supra*). This is further disputed with regard to the implication that any physical restraints were used other than minimal hands-on contact and disputed as to the use of any "seclusion".

5. This is disputed. Holloway did not state that she ever spoke to Hall during these drop off times.

6. This is disputed. There is no evidence that any IEP meetings occurred during the short timeframe in which the quiet room was used for E.C.

7. This is disputed. Hall recalled no emergency contacts were on file for Holloway [Hall Deposition, 35:4-23]. Furthermore, as previously stated, Holloway would not answer her phone and messages could not be left due to the voicemail box being full.

8. This is disputed that either E.C. or Q.C. broke down in tears while still enrolled at Rosemont Elementary School. It is undisputed that in the interim five years with Holloway frequently rehashing the allegations in the Third Amended Complaint with the children that the evidence shows they have broken down in tears talking about Rosemont Elementary after no longer being enrolled.

9. This is disputed to the extent that there is no evidence such reactions occurred during the time E.C. was enrolled at Rosemont Elementary School. It is not disputed that such behaviors may have started occurring after Holloway removed him from Rosemont Elementary School and

frequently talked to him about the allegations in the Third Amended Complaint in the interim time period.

10. There is no evidence that Q.C. had any such issues while enrolled at Rosemont Elementary School but it is unknown by the Defendants whether Q.C. developed such issues after Holloway removed her from the school.

11. This is not disputed that Holloway claims E.C. told her about the quiet room in June but disputed as to the statement that "he was being kept in a locked room for most of the day" as the evidence clearly contradicts this.

12. It is undisputed that Holloway so stated in her deposition. Such an alleged statement by Q.C. shows that she was mimicking the statement her older brother, E.C., had made to Holloway.

13. This is disputed in that E.C. was neither "secluded" nor "abused" but not disputed that E.C. made some statement to a police officer in June 2017.

14. This is disputed. Holloway stated that E.C. cried at the sight of school buses *after* he was no longer enrolled at Rosemont Elementary. Furthermore, E.C. did not want to go to school because he wanted to stay with his sister and go to the hospital with her and his mother rather than go to school. Additionally, Holloway said that she dropped the children off at school every day but then also stated E.C. would "challenge every day to get on the school bus." [Holloway deposition, 40:5-41:22]

15. This is disputed with regard to the mischaracterization of the quiet room as a "seclusion room". It is undisputed that when Holloway made a proper request for the video, Safe Schools reviewed and provided the available video footage to her.

16. This is disputed. Hall denies having any such conversation with Holloway. See fn. 8, *supra*.

17. This is disputed as to any such requirement and even the new policies subsequently enacted by the Virginia Department of Education would not require such forms for the use of "timeouts" such as the short time in the quiet room with an adult.

18. This is disputed as written. Attempts were made to call a parent and forms were sent home in the student's backpack.[9]

19. This is disputed as to the mischaracterization of the supervised, short timeout period in the quiet room being characterized as "spent time in the seclusion room."

20. This is not disputed that Holloway claims to have never received such paperwork.

21. This is correct that Williams did not receive training about how to use a seclusion room; in fact, there was no seclusion room in use. The "quiet room" was a de-escalation space where students were supervised and thus, not "secluded". Furthermore, since only Hall decided if and when a student would be placed in a timeout in the quiet room and she was always present with the child at such time, training for Williams was unnecessary. [Hall deposition, 31:12-23; Williams deposition, 46:8-13].

22. This is disputed as to the mischaracterization of the quiet room as a "seclusion room."

23. This is not disputed.

24. This is not disputed. There is no credible evidence to establish that E.C. was ever in the quiet room for longer than approximately fifteen minutes.

---

[9] Williams Deposition [30-10-22]:

Q. Are those incident reports shared with the parents of students?
A. Yes. They are signed and sent home.
Q. When you say they are sent home, how are they sent home?
A. In backpack and also, to the greatest extent possible, a phone call is made home.
Unfortunately in Miss Holloway's case, we couldn't reach her. He phone was always busy or the voice mailbox would not handle any more calls.

25. This is not disputed.

26. This is disputed and a mischaracterization of the testimony. The testimony was that E.C. could not remain in the hallway running around due to the SOL testing requirements. [10] [Hall deposition, 45:10-25]

27. This is not disputed.

28. This statement is misleading as far as the mischaracterization of the quiet room as a "seclusion room" and in the claim that Hall unilaterally modified the quiet room when, as set forth above on page 3, footnote 4, the posters were ripped down and the fidgets and other items became projectiles and were thus removed from the quiet room for safety.

29. This is not disputed. Policies were not required until January 1, 2021. In 2015, the Virginia Legislature enacted a law (Va. Code § 22.1-279.1:1) directing the Virginia Board of Education to adopt regulations on the use of seclusion and restraint. This law was further amended in 2019. In 2020, 8VAC20-750-40 was enacted with an effective date of January 1, 2021. The Virginia Beach School Board has been in full compliance with the law at all times.

30. This is disputed as to the existence of "seclusion rooms." Quiet rooms did exist at some schools, including the one at Rosemont Elementary School.

---

[10] Hall deposition [45:10-25]

Q. Okay. Was he ever taken to a different space to deescalate prior to being placed in the quiet room on the same day, the same time of the incident?
A. In the hallway. So we would always provide opportunities for him to walk, if he was willing. Again, a dynamic during this time was that it was State testing. So he could not be disruptive in the hallways. So he was provided an opportunity to deescalate in his classroom and that didn't work. 15 minutes typically was the max. We were going to have other students be displaced. Then always give him the opportunity to walk in the hallway, if he could do that without disruption, and then the quiet room.

31.  As stated in paragraph 29, above, the School Board followed the laws of the Commonwealth of Virginia and adopted the regulations of the Virginia Board of Education and has at all times been in compliance with the law.

32.  As stated in paragraph 29, above, the School Board followed the laws of the Commonwealth of Virginia and adopted the regulations of the Virginia Board of Education and has at all times been in compliance with the law.

33.  This is disputed as to the characterization of the quiet room as a "dangerous seclusion room." Further, there should be no implication that the School Board following advice of counsel is in any way an admission of wrongdoing when faced with a highly litigious parent seeking a public forum.

34.  This is not disputed except for the mischaracterization of the quiet room as a "seclusion room."

35.  This is not disputed except for the mischaracterization of the quiet room as a "seclusion room." By way of clarification, Ms. Hall so stated to the best of her recollection given that her deposition took place nearly five years after the fact.

36.  This is not disputed except for the mischaracterization of the quiet room as a "seclusion room." By way of clarification, Ms. Williams so stated to the best of her recollection given that her deposition took place nearly five years after the fact.

37.  This is disputed. The allegations in the Third Amended Complaint took place in June 2017, Ms. Williams retired from teaching in 2018, Holloway removed E.C. and Q.C. from Rosemont Elementary School in 2017, and neither Williams nor Hall have had any access to E.C.'s or Q.C.'s records during the intervening nearly five-year period from the alleged incident(s) and the taking of their depositions. [Williams deposition, 5:1-3; Hall deposition, 24:4-16].

IV. **Conclusion**

LaTasha Holloway bases her claims on the statements allegedly made by her children in 2017 when they were five and six years old, respectively. During the intervening nearly-five-year timeframe, is undisputed that Holloway has talked to her children about the alleged incidents in the Third Amended Complaint on a daily or nearly daily basis. Ms. Holloway herself greatly embellishes her testimony for effect and repeatedly describes the quiet room as a dungeon or torture chamber of sorts twenty-eight times during the course of her deposition when the evidence clearly establishes that, at most, the room in question is a small room with automatic lights and a lever door handle located off the main hallway at Rosemont Elementary School. [see generally, Holloway Depo, Doc. 43-2]. The evidence is clear that E.C. exhibited escalating behavioral issues in the Spring of 2017 that necessitated the Defendants taking action to protect E.C. and his fellow students. The Defendants' options were limited by Holloway's being unreachable by phone. Holloway had further given explicit instructions for the Defendants to do whatever they needed to do to keep the children in school. These material facts are not in dispute and summary judgment should be granted to the Defendants.

Respectfully submitted this 2nd day of June, 2022.

**ALISON WILLIAMS,
CARI HALL,
SCHOOL BOARD FOR THE CITY OF
VIRGINIA BEACH**

By: ___/s/ Anne C. Lahren_____

Richard H. Matthews, Esq.
Virginia State Bar No. 16318
***Pender & Coward, P.C.***
222 Central Park Avenue, Suite 400
Virginia Beach, VA  23462-3026
(757) 490-6256 – Telephone
(757) 497-1914 – Facsimile
Email: rmatthew@pendercoward.com

*Counsel for Defendants Alison Williams,*
*Cari Hall, and the School Board for*
*the City of Virginia Beach*

Anne C. Lahren, Esq.
Virginia State Bar No. 73125
**Pender & Coward, P.C.**
222 Central Park Avenue, Suite 400
Virginia Beach, VA  23462-3026
(757) 490-6293 – Telephone
(757) 497-1914 – Facsimile
E-Mail: alahren@pendercoward.com
*Counsel for Defendants Alison Williams,*
*Cari Hall, and the School Board for*
*the City of Virginia Beach*

## CERTIFICATE OF SERVICE

      I hereby certify that on this the 2nd day of June, 2022, I will electronically file the foregoing *REPLY TO PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT* with the Clerk of Court using the CM/ECF system, which will then notification of such electronic filing (NEF) to the following:

Dustin M. Paul (VSB #75287)
Gaela R. Normile (VSB #95912)
Daniel L. Stephens (VSB #95012)
Vandeventer Black LLP
101 W. Main Street, Ste. 500
Norfolk, VA 23510
(757) 446-8600 – Telephone
(757) 446-8670 – Facsimile
dpaul@vanblacklaw.com
gnormile@vanblack.com
dstephens@vanblack.com
*Counsel for Plaintiff LaTasha Holloway*

                                                                      /s/ Anne C. Lahren
                                        Anne C. Lahren, Esq.
                                        Virginia State Bar No. 73125
                                        **Pender & Coward, P.C.**
                                        222 Central Park Avenue, Suite 400
                                        Virginia Beach, VA  23462-3026
                                        (757) 490-6293 – Telephone
                                        (757) 502-7370 – Facsimile
                                        Email: alahren@pendercoward.com
                                        *Counsel for Defendants Alison Williams,*

*Cari Hall, and the School Board for
the City of Virginia Beach*